UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 11 |
| HARI RAM, INC | * | |
|     Debtor-in-Possession | * | |
| | * | CASE NO. 1:13-bk-06524MDF |
| HARI RAM, INC., | * | |
|     Movant | * | |
| | * | |
| v. | * | |
| | * | |
| MAGNOLIA PORTFOLIO, LLC, | * | |
|     Respondent | * | |

## OPINION

Before the Court is the motion of Hari Ram, Inc., ("Debtor") for the use of cash collateral (the "Motion"). Debtor concedes that Magnolia Portfolio, LLC ("Magnolia") holds a mortgage and is perfected by an assignment of rents and a UCC financing statement. Debtor asserts, however, that the hotel room revenues are property of the estate and that it has offered to provide adequate protection for Magnolia's interest in Debtor's assets. Conversely, Magnolia objects to Debtor's use of its cash collateral because, either (1) Debtor's interest in the hotel room revenues was terminated before the petition was filed or, alternatively, (2) Debtor is unable to adequately protect Magnolia's security interest. For the reasons set forth below, the Court finds that even if Debtor retains an interest in the cash collateral, it is unable to provide adequate protection to Magnolia's interests. Thus the motion to use cash collateral will be denied [1]

---

[1] The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is core pursuant to 28 U.S.C. § 157(b)(2)(A),(B), and (O). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052, which is applicable to contested matters pursuant to Fed. R. Bank. P. 9014.

## I. BACKGROUND

Debtor is the owner and operator of a hotel located at 350 Bent Creek Boulevard, Mechanicsburg, Pennsylvania, (the "Mechanicsburg Hotel"). Magnolia was not the original lender, but acquired its position through an assignment by Orrstown Bank ("Orrstown"). In 2001, Debtor executed a promissory note in the principal amount of $2,669,000 secured by a mortgage ("First Mortgage") and an assignment of rents ("First Rent Assignment") (collectively "First Mortgage Documents") to finance the construction of the Mechanicsburg Hotel. The First Mortgage Documents were recorded in the Recorder of Deeds Office of Cumberland County, Pennsylvania. Debtor also executed a Commercial Security Agreement granting Orrstown a security interest in various personal property including furniture, fixtures, equipment, accounts receivable, inventory, general intangibles, rents, and "payments." Ex. B3. The security interest in personal property was perfected by the filing of a UCC financing statement with the Commonwealth.[2] Neither the First Mortgage Documents nor the Commercial Security Agreement includes provisions for the collateralization of future advances.

Under the terms of the First Mortgage, Debtor granted to Orrstown "right, title, and interest in and to the [Mechanicsburg Hotel], together with all . . . improvements and fixtures . . . equipment . . . and other articles of personal property, and . . . all present and future rents, revenues, income, issues, royalties, profits and other benefits derived from the [Mechanicsburg Hotel]." Ex. M-2. Additionally, Debtor was required "to pay to Lender all amounts secured by [the First Mortgage Documents] as they become due, and . . . strictly perform all of [Debtor's]

---

[2]For reasons not in the record, Orrstown did not file a UCC-1 financing statement until 2006.

obligations under [the First Mortgage Documents]." Ex. M-2. The First Rent Assignment created a "continuing security interest in all of [Debtor's] rights, title, and interest in and to the Rents from the [Mechanicsburg Hotel], under which "Rents" were defined as "all rents, revenues, income, issues, profits and proceeds from the [Mechanicsburg Hotel]. . . ." Ex. M-3. The First Rent Assignment provided that it was given " to secure (1) payment of the indebtedness and (2) performance of any and all obligations of [Debtor] under the Note, this assignment, and the related documents." Ex. M-3. The First Rent Assignment authorized Debtor to control and manage the Mechanicsburg Hotel and to collect "the Rent," but it also authorized Orrstown to "send notices to any and all tenants of the [Mechanicsburg Hotel] advising them of the [First Rent ]Assignment and directing all Rents to be paid directly to [Orrstown] or [Orrstown's] agent." Ex. M-3.

In 2008, Orrstown loaned $5,740,000 to Gurugovind, LLC, ("Gurugovind") to construct a hotel in Enola, Pennsylvania (the "Enola Hotel"). Orrstown also made a second loan to Gurugovind of $640,000 on the same date. Both loans to Gurugovind were conditioned on the pledge of additional security by Debtor in the form of two mortgages on the Mechanicsburg Hotel ( the "Gurugovind Mortgages") and two further assignments of rent from the Mechanicburg Hotel (the "Gurugovind Rent Assignments") (collectively, the "Gurugovind Documents"). The Gurugovind Mortgages included cross collateralization clauses, which state that the mortgages secure:

> all obligations, debts and liabilities, plus interest thereon, of either [Debtor] or [Gurugovind] to [Orrstown], or any one or more of them, as well as all claims by [Orrstown] against [Gurugovind] or [Debtor] or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or

3

> indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether [Gurugovind] or [Debtor] may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recover upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Exs. M-5, M-8. Although Debtor executed the Gurugovind Assignments as separate documents, the Gurugovind Mortgages also provided that Debtor agreed to assign to Orrstown all of its "right, title, and interest in and to all present and future leases of the Property and all Rents from the Property." Exs. M-5, M-8. Under the terms of the Gurugovind Mortgages, rents are defined as " all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the [Mechanicsburg Hotel]. Exs. M-5, M-8. Debtor did not execute the notes executed in connection with the financing of the Enola Hotel, but the Gurugovind Mortgages specify that "[Gurugovind] and [Debtor] shall pay to [Orrstown] all indebtedness secured by [the mortgages] as [they] become due. Exs. M-5, M-8. "Indebtedness" is described as "all principal, interest, and other amounts, costs and expenses payable" under the promissory notes executed in connection with the two 2008 loans. Exs. M-5, M-8.

It is unclear from the record whether Gurugovind defaulted on the loans before or after the First Mortgage Documents and the Gurugovind Documents were assigned to Magnolia, but on December 13, 2013, Magnolia sent a letter to Debtor asserting that it had defaulted " on a certain loan" and, therefore, Magnolia had elected to collect "proceeds" generated by the Mechanicsburg Hotel. Ex. M-12. In response to this demand for the payment of hotel room revenues, Debtor filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on December 24, 2013. Among other "first day" motions, Debtor sought permission to use

4

Magnolia's cash collateral. In support of the Motion, Debtor argued that hotel room revenues are personal property and not an interest in real property. In the alternative, Debtor asserted that even if hotel room revenues were determined to be an interest in real property, the Court should find that Debtor's interest in the revenues was not terminated pre-petition and that the revenues are property of the estate. Additionally, Debtor asserted that it is only personally liable to Magnolia under the First Mortgage Documents, which were not in default, and is not personally liable under the Gurugovind Documents. The Court held an expedited hearing on December 30, 2013, after which it entered an interim order authorizing Debtor's use of cash collateral with certain limitations. A final hearing was held on February 4, 2014.

At the final hearing, the parties stipulated that the primary issue was a legal one. Are the hotel revenues an interest in real property, like tenant rents, such that Magnolia's notice to Debtor that all "proceeds" were to be remitted to Magnolia terminated Debtor's interest in the hotel revenues before the petition was filed? Alternatively, are hotel revenues personal property that became property of the estate upon the filing of the petition? If the hotel room revenues were found to be property of the estate, then the parties agreed that the Court was required to determine whether Magnolia's secured interest in cash collateral was adequately protected.

Both parties primarily relied on the exhibits admitted at the hearing in support of their respective positions. Debtor also presented the testimony of Gavin Patel ("Patel"), who testified that he supervises Debtor's financial operations and, working with an accountant, prepared a forecast of Debtor's operations through September 2014. Patel testified that Debtor would be able to service all debt listed in the projections and obtain a positive cash flow by the end of the period. The projections included the debt service on the First Mortgage, but did not include

5

payment of the loans secured by the Gurugovind Mortgages. Because Debtor asserts that it is not personally obligated to Magnolia under the Gurugovind Documents, payments on the Gurugovind obligations were not included as expenses in the nine-month forecast. Debtor also asserted that the First Mortgage is not in default and has never been in default, which Magnolia did not dispute.

In the balance sheet attached to the petition, Debtor states that it has total assets of $2,911,049.72, total liabilities of $1,818,233.07, and total equity of $1,092,626.65. The obligation to Magnolia on the First Mortgage is listed at $1,428,045.38. On its income statement, Debtor reports net income for the period January through November 2013 of $260,490.36. At the hearing, Patel testified that in its forecasted statement of revenue and expenses for January through September 2014, Debtor anticipates net ordinary income of $114,149.74. After deducting debt service on the First Mortgage, and without factoring in payments on the Gurugovind Mortgages, Debtor's net operating income reflects a loss of $39,419.71. Once expenses for depreciation and amortization are added back, Debtor projects a positive cash flow of $54,405 for the nine-month period. Patel testified that Debtor anticipates that it will experience negative cash flows through April 2014, but expects to have positive cash flows May through August 2014.

Magnolia argued that the financial projections did not accurately reflect Debtor's obligations. It asserted that under the terms of the Gurugovind Mortgages, Gurugovind and Debtor "shall pay to the Lender all indebtedness secured by this Mortgage as it becomes due, and [Gurugovind] and [Debtor] shall strictly perform all [Gurugovind's] and [Debtor's] obligations

6

Case 1:13-bk-06524-MDF    Doc 85    Filed 03/05/14    Entered 03/05/14 12:48:40    Desc
Main Document    Page 6 of 18

under the Mortgage." Ex. M-5, M-8. At the time of the final hearing, the outstanding balance on the two Gurugovind Mortgages was approximately $5.15 million.

## II. DISCUSSION

*A. Standards for use of cash collateral*

Under § 363(c)(2), a debtor may not use cash collateral unless consent is obtained from creditors that have an interest in the collateral, or the bankruptcy court authorizes its use. If the creditor does not consent, cash collateral may be used by the debtor only to the extent that the court determines that the creditor's interest in the collateral is adequately protected. 11 U.S.C. § 363(e). "Cash collateral" includes:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents . . . and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in §552(b), whether existing before or after the commencement of a bankruptcy case.

11 U.S.C. § 363(a). Adequate protection is not defined in the Bankruptcy Code, but § 361 provides three non-exclusive methods as examples: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest. 11 U.S.C. § 361. When devising a proposal for adequate protection of a secured creditor's interest, the proponent "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir. 1984), *quoted In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994). The burden of proof is on the debtor

7

to demonstrate that the secured creditor is adequately protected for purposes of using its cash collateral. *Id.* § 363(p)(1).

Debtor proposes to use the hotel room revenues generated from the operation of the Mechanicsburg Hotel and to provide adequate protection through a replacement lien on future receipts. Before I can examine the adequacy of adequate protection being offered to Magnolia, I must determine whether the revenues are property of the estate under 11 U.S.C. § 541(c). Debtor asserts that the hotel room revenues are personal property, recognized by Magnolia as such, by the filing of a UCC financing statement. Magnolia counters that the UCC1 was filed in an abundance of caution and that the revenues should be equated with "rents" and, thus, derived from real property. Magnolia asserts that under Pennsylvania law, Debtor's interest in the hotel room revenues was terminated when Gurugovind defaulted on loans secured by the Mechanicsburg Hotel, and Magnolia responded by demanding that Debtor collect and remit the hotel revenues to Magnolia.

B. *Are hotels revenues interests in real property?*

If hotel revenues are equated with rents, the protections afforded to mortgagees under Pennsylvania law must be considered. Under *Butner v. United States*, 440 U.S. 48 (1979), the U.S. Supreme Court held that a "mortgagee is afforded . . . the same protection he would have under state law if no bankruptcy had ensued." *Id.* at 56. The Third Circuit has held that when defining the relationship between a mortgagor and a mortgagee, Pennsylvania follows the title theory. Under this theory a mortgage is a transfer of a fee simple interest in real property to the creditor. *Sovereign Bank v. Schwab,* 414 F.3d 450, 453 n. 5 (3d Cir.2005) ("Pennsylvania follows the title theory whereby the mortgage is considered a conveyance in fee simple to the creditor.")

(citing *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34, 38 (3d Cir.1993)). While the Third Circuit has placed Pennsylvania solidly in the "title theory" camp, the Supreme Court of Pennsylvania historically has adopted a more nuanced analysis. "Although in form an absolute conveyance of title, a mortgage is in reality only a security for the payment of money." *Girard Trust Co. v. City of Philadelphia*, 87 A.2d 277, 369 Pa. 499 (1952). An examination of the decisions of the Pennsylvania appellate courts reveals that the Commonwealth is, in actuality, an intermediate theory state – a mortgage is both a grant of a security interest and a conveyance. *See* John J. Rapisardi, Elliot L Hurwitz, *The Mortgagee's Right to Rents After Default: An Unsettled Controversy* , 6 J. Bank. L. & Prac. 331, App. (1997). In Pennsylvania, a mortgage has the dual function of transferring a property interest from the mortgagor to the mortgagee, while also serving as a lien between the mortgagor or mortgagee as to third parties. *Pines v. Farrell,* 577 Pa. 564, 573-74, 848 A.2d 94, 99-101 (2004). In *Pines*, the Pennsylvania Supreme Court held that in regard to the Commonwealth's recording acts, documents related to mortgages (including assignments, satisfactions, and releases) are conveyances. But the Court suggested that its holding was limited and that the title theory would not necessarily apply in the context of bankruptcy or foreclosure. *Id.* at 575 n. 7.

  In the *Mountain View* case, the Third Circuit adopted the title theory as to mortgages when considering the treatment of an assignment of rents in the context of a bankruptcy case. The debtor in *Mountain View*, the owner of an apartment complex, defaulted on mortgages held by two banks before it filed for bankruptcy. The mortgagees took possession of the property, notified the tenants to pay rents to them under an assignment of rents, and entered judgments in foreclosure against the owner. Only after the banks had been collecting the rents for more than

9

ninety days did the debtor commence a bankruptcy case and seek turnover of the rents. The bankruptcy court ruled that the debtor retained an equitable interest in the rents, which became property of the estate and the creditor's cash collateral. On appeal, the district court disagreed with the bankruptcy court's analysis, finding that under Pennsylvania law, the banks held title to the rents. The Third Circuit affirmed the district court, holding that the debtor retained no equitable interest in the post-petition rents. The Circuit determined that the debtor's rights were cut off when it defaulted on the loans and the banks began to collecting rents from the tenants. *Mountain View*, 5 F.3d at 38. Accordingly, the Third Circuit determined that Pennsylvania law enables a mortgagee to terminate the rights of a mortgagor in rents generated by the mortgaged property if the mortgagee takes actual or constructive possession of the real property and begins collecting the rents before a bankruptcy petition is filed.

In the within case, Magnolia determined that Debtor was in default under the terms of the Gurugovind Mortgages based upon the cross collateralization provisions of the Gurugovind Documents. It then sent a letter to Debtor declaring the default and demanding that the hotel revenues be forwarded to Magnolia. There is no evidence in the record that Debtor complied with this demand.

The question in the within case is whether like rents, the assignee of an assignment of rents may cut off the rights of the assignor in hotel room revenues by declaring a default in the underlying obligation and demanding that the revenues be collected by the assignor and turned over to the assignee. If a debtor's interest in hotel revenues can be terminated under an assignment of rents, the debtor retains no rights in the receipts, they are not property of the estate and they would not constitute cash collateral.

The parties did not direct the Court to a case directly on point, and the Court has been unable to locate a case interpreting Pennsylvania law that answers this precise question.[3] Courts in other jurisdictions are divided on the issue. In the decision of *In re Old Colony, LLC*, 476 B.R. 1 (Bankr. D. Mass. 2012), the bankruptcy court reviewed cases on each side of the divide. As the court noted, the majority of courts have held that hotel revenues are personal property, not interests in real estate. *Id.* at 20. When examining state law, the courts in these cases reasoned that a hotel guest, who is a licensee, enjoys more limited rights in real property than is afforded to a tenant under a lease. Decisions holding that hotel revenues are personal property also emphasize that the rental of a hotel room, unlike a lease, typically encompasses a bundle of services. *In re Old Colony* at 20-21 (citing cases). The less substantial interest enjoyed by hotel guests have provided the basis for these courts to conclude that hotel revenues are accounts receivable or general intangibles and not interests in real property. *In re Ocean Place Development, LLC,* 447 B.R. 726, 732 (Bankr. D. N.J. 2011); *In re HT Pueblo Properties, LLC,* 462 B.R. 812, 820 (Bankr. D. Col. 2011); *In re Oceanview/Virginia Beach Real Estate Associates,* 116 B.R. 57, 59 (Bankr. E.D. Va. 1990).

---

[3]The Bankruptcy Court for the Western District of Pennsylvania has held that a mortgagee's UCC-1 financing statement, which referred to "all contracts and agreements relative to the construction, management, use and occupancy of the Improvements" and their proceeds, was sufficient to create a security interest in hotel revenues. *In re Blue Ridge Motel Associates*, 106 B.R. 81, 82 (Bankr. W.D. Pa. 1989). The issue of whether the hotel revenues could be subject to an assignment of rents and, thus, constitute an interest in real property was not before the court. Likewise, in dicta, the Bankruptcy Court for the Eastern District of Pennsylvania has opined that hotel room revenues are not an interest in real property. *In re W. Chestnut Realty of Haverford, Inc*., 166 B.R. 53, 56 (Bankr. E.D. Pa. 1993) *aff'd*, 173 B.R. 322 (E.D. Pa. 1994).

The *Old Colony* court determined that the minority position that room revenues are rents and, thus, an interest in real estate, was more persuasive. *In re Old Colony,* 476 B.R. at 21-23. The minority courts have concluded that "rent" is an expansive concept encompassing all consideration paid for the occupancy of real property. *Id*. at 22. Two of the decisions in the minority group are by circuit courts. *See Fin. Sec. Assurance, Inc. v. Days Cal. Riverside Ltd. P'ship (In re Days Cal. Riverside Ltd. P'ship),* 27 F.3d 374, 377 (9th Cir. 1994); *Matter of T-H New Orleans Ltd. Partnership,* 10 F. 3d 1099, 1105 (5th Cir. 1993).[4]

In *Days Cal.*, the Ninth Circuit characterized hotel revenues as rent in the context of addressing the issue of whether the revenues were subject to the security agreement entered into by the parties before the bankruptcy filing. *Days Cal.*, 27 F.3d at 375.[5] In the court's decision and in the cases upon which it relied, hotel revenues were regarded as rents to effectuate the intention of the parties to create a security interest in the receipts, which otherwise would have been lost once a debtor filed for bankruptcy. The Ninth Circuit in *Days Cal*., and other decisions issued before § 552 of the Bankruptcy Code was amended in 1994, were concerned that lenders would

---

[4]Declining to look to state law, the Eleventh Circuit held in *Financial Sec. Assur., Inc. v. Tollman-Hundley Dalton, L.P.*, 74 F.3d. 1120, 1124 (11th Cir. 1996), that hotel revenues were "rents" as defined in Black's Law Dictionary and, therefore, were included in the exception to §552(a) set forth in § 552(b). See discussion of former statute in footnote 5.

[5]At the time the *Days Cal.* decision was rendered, § 552(a) of the Bankruptcy Code provided that property acquired by the estate after the petition was filed was not subject to a lien entered into by the debtor before the case was filed. Section 552(b) excepted "proceeds, product, offspring, rents, or profits" from this rule. 11 U.S.C. § 552(b) (amended 1994). Section 552(b)(2) now provides that if a creditor has a security interest in rents, or "fees charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. 11 U.S.C. § 552(b)(2).

lose their bargained-for security interests in hotel room revenues when mortgagors filed for bankruptcy. *See Id.* at 377 (finding that to hold that hotel revenues were not rent "would discourage the financing of what is a multi-billion dollar industry in the state"). In *T-H New Orleans*, the Fifth Circuit held that hotel revenues are "like rent" in that they are produced by real property. Further, they may not be considered personal property as they are excluded from the Louisiana statutory definition of accounts receivable as an "indebtedness due to or arising out of the leasing of immovable property." *Id*. at 1105 (citing La. R.S. §9:3101(1) (repealed)). As the analysis of the Fifth and Ninth Circuit decisions illustrate, however, whether hotel revenues are derived from real property and treated as rents can only be resolved by reference to state law.

In the absence of controlling authority, I find persuasive the bankruptcy court's analysis of Pennsylvania law in *In re W. Chestnut Realty of Haverford, Inc*., 166 B.R. 53, 56 (Bankr. E.D. Pa. 1993) *aff'd*, 173 B.R. 322 (E.D. Pa. 1994). In dicta the Eastern District determined that hotel revenues are not rents. This conclusion was based on the court's observation that the status of a tenant in Pennsylvania is markedly different from the status of a licensee. A tenant is given the right to possess and use the landlord's premises in subordination of the landlord's title in consideration of the payment of rent. *Id.* at 55-56 (citing *In re Wilson's Estate,* 349 Pa. 646, 648, 37 A.2d 709, 710 (1944)). The rights of a licensee are more limited and generally described as "an authority to do a particular act or series of acts upon another's land, without possessing any estate therein." *Baldwin v. Taylor*, 166 Pa. 507, 511, 31 A. 250, 251 (1895), *cited in Yocca v. Pittsburgh Steelers Sports, Inc.*, 806 A.2d 936, 949 (Pa. Commw. Ct. 2004) *rev'd on other grounds*, 854 A.2d 425 (Pa. 2004). Unlike a tenant who pays rent to a landlord, a hotel guest does not acquire a right to possess or use the real property in subordination of a debtor's title. Guests

13

are not tenants; they are licensees. Although I am inclined to agree with the courts finding that hotel revenues are not rents, it is unnecessary for me to decide this issue.[6] The record before me fails to establish that Magnolia took the required steps to terminate Debtor's interest in the hotel revenues pre-petition.

C. *Did Debtor retain an interest in the hotel revenues when the petition was filed?*

A mortgagor has the right to continue to receive rents from real property until a mortgagee obtains possession. *J.H. Streiker & Co. v. SeSide Co., Ltd. (In re SeSide Co., Ltd.),* 152 B.R. 878, 883 (E.D. Pa. 1993) (citing *Sandal v. Jersey Mortg. Inv. Co.*, 306 Pa. 1, 158 A. 865, 865-66 (1932)). After the mortgagor defaults, a mortgagee may enter into possession of the mortgaged property and collect the rents from tenants. *Id*. (citations omitted). Even when the mortgage contains an assignment of rents clause, enforcement of the mortgagees rights can only be accomplished by taking possession of the property and applying the rents to the mortgage until the debt is paid. *Mountain View,* 5 F.3d at 38 (citing *Bulger v. Wilderman and Pleet,* 101 Pa. Super. 168, 171 (Pa. Super.1931)). "A mortgagee can obtain 'possession' of realty and consequently obtain a present right to receive rents in two ways: (1) by entering into 'actual possession' of the real estate through foreclosure or acting as a mortgagee in possession; or (2) by taking

---

[6]In support of its argument, Magnolia notes that the Uniform Assignment of Rents Act ("UARA") follows the Restatement (Third) of Property approach of defining rents to include "sums payable for the right to possess or occupy, or for the actual possession or occupancy of, real property of another person." UARA § 2(12)(A) (2005) *cited in* R. Wilson Freyermuth, *Modernizing Security in Rents: The New Uniform Assignment of Rents Act*, 71 Mo. L. Rev. 1, 20 (2006). Thus, the UARA would treat hotel room revenues as "rents." However, the UARA also provides that an assignment of rents creates only a security interest in rents, regardless of whether or not the agreement purports to be a conveyance of title.

Case 1:13-bk-06524-MDF    Doc 85    Filed 03/05/14    Entered 03/05/14 12:48:40    Desc
Main Document    Page 14 of 18

'constructive possession' of the realty by serving demand notices on the mortgagor's tenants." *SeSide,* 152 B.R. at 883 (citing *Fogarty v. Shamokin & Mount Carmel Transit Co.,* 367 Pa. 447, 451, 80 A.2d 727, 728–29 (1951); *Colbassani v. Society of Christopher Columbus,* 159 Pa. Super. 414, 417, 48 A.2d 106, 107 (1946); *Bulger,* 101 Pa. Super. at 176–77.) Enforcement of the lien must be accomplished through this process even though the mortgagee has a perfected security interest in the rents. *Mountain View,* 5 F.3d at 38. Accordingly, Magnolia could obtain the right to receive the rents and, thereby, cut off Debtor's rights only by taking possession of the Mechanicsburg Hotel or by serving notice on the "tenants." Magnolia did not take possession of the Mechanicsburg Hotel, nor did they serve notice on Debtor's tenants. As discussed above, hotel guests are not tenants and, further, as acknowledged by Magnolia, service on hotel guests would be impractical. Therefore, the hotel room revenues remained property of the estate when Debtor filed its petition.

*D. Is the protection Debtor has offered to provide to Magnolia's collateral adequate?*

Although Magnolia did not succeed in cutting off Debtor's interest in the hotel room revenues generated by the Mechanicsburg Hotel, the revenues are subject to a valid security interest that was perfected by the filing of a UCC1. Therefore, they are cash collateral subject to the requirements of adequate protection.

A bankruptcy court should apply the following standard when determining whether a debtor should be permitted to use cash collateral:

> (1) The court must establish the value of the secured creditor's interest; (2) The court must identify risk to the secured creditor's value resulting from the debtor's request for use of cash collateral; and (3) The court must determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

15

*Martin v. United States (In re Martin)*, 761 F.2d 472, 476-77 (8th Cir. 1985).

In addition to reviewing the debtor's adequate protection proposal, the court should consider whether there is any reasonable chance of reorganization. If a debtor is engaged in an obviously futile attempt to reorganize, it should not be permitted to jeopardize a creditor's cash collateral. *In re C.F. Simonin's Sons, Inc.*, 28 B.R. 707, 711 (Bankr. E.D.N.C. 1983). *See also Sharon Steel Corp. v. Citibank, N.A.*, 159 B.R. 165, 172 (Bankr. W.D. Pa. 1983) (holding that debtor could not use cash collateral although objecting creditors were oversecured when business plan was unrealistic and unattainable).

Debtor does not dispute that under the First Mortgage Documents Magnolia has a perfected security interest in personal property, including accounts receivable and intangibles. If the hotel room receipts are considered "rents," Magnolia has a lien under the First Rent Assignment. Debtor argues that because the Mechanicsburg Hotel is projected to generate a positive cash flow in nine months, when the equity in the real estate is also considered, Magnolia's interest in cash collateral is adequately protected.

Debtor's argument is flawed for several reasons. First, whether Magnolia's interest in the hotel room revenues is characterized as personal property or as real property, Magnolia has a continuing security interest in the revenues under § 552(b)(2). Unlike other forms of cash collateral, a pre-petition security interest in hotel room revenues continues to attach to post petition revenues. 11 U.S.C. § 552(b). Under these circumstances, the offer of a replacement lien on the post-petition rents is meaningless because the creditor already has a lien on these assets. *See In re Buttermilk Towne Center, LLC*, 442 B.R. 558, 566 (B.A.P. 6th Cir. 2010) (holding that future rents do not provide adequate protection for the debtor's expenditure of prior months rents;

*In re Las Torres Dev., LLC*, 413 B.R. 687, 696-97 (Bankr. S.D. Tex 2009) (holding that it was "disingenuous" to offer replacement lien on post-petition rents because lender already had lien on rents); *In re Chatham Parkway Self Storage, LLC*, 12-42153, 2013 WL 1898058 (Bankr. S.D. Ga. Apr. 25, 2013) (holding that replacement lien in rents is "illusory" because § 552(b) provides lien on post-petition rents).

Debtor also fails to recognize that even if it were not personally liable on the Gurugovind loans, the Gurugovind Mortgages on the Mechanicsburg Hotel secure the loans and consume any remaining equity above the First Mortgage. Debtor does not argue that Gurugovind is not in default on the Magnolia loans. Therefore, Magnolia is entitled to look to the second and third mortgages for the satisfaction of its claim on the Gurugovind loans. While the remedies of a secured creditor can be suspended or abrogated, "the value of its secured position as it existed at the commencement of the case is to be protected throughout the case when adequate protection is required. *Matter of Malaspina*, 30 B.R. 267, 270 (Bankr. W.D. Pa. 1983) (quoting *Collier on Bankruptcy*, § 361.01 at 361-6, 15th. ed. 1982). Debtor projects that at the end of nine months it will have a positive cash flow. Through April, however, it expects to operate at a loss. In the absence of other sources of adequate protection, the forecasted profitability of Debtor's operations nine months from the petition date alone is insufficient to provide Magnolia with adequate protection.

Finally, while Debtor did not execute a separate note or bond and may not have explicitly guaranteed the financing of the Enola Hotel, the Gurugovind Mortgages incorporate a personal obligation by Debtor to pay the "indebtedness" incurred by the related entity and the "indebtedness" as described as the amounts payable under the promissory notes executed in

17

Case 1:13-bk-06524-MDF    Doc 85    Filed 03/05/14    Entered 03/05/14 12:48:40    Desc
Main Document    Page 17 of 18

connection with the two 2008 loans. Personal liability for a debt typically is created through the execution of a note or bond. But the Pennsylvania Supreme Court has observed that "there may be mortgages not accompanied by any other evidence of indebtedness but which constitute in and of themselves both the obligation and the conveyance of the property intended to secure it." *Girard Trust Co.* 369 Pa. at 503, 87 A.2d at 279. Under the terms of the Gurugovind Mortgages, both Debtor and Gurugovind were obligated to make payments on the debt to Magnolia. When this additional obligation is considered, which was not included in Debtor's projected expenses, it becomes apparent that Debtor will be unable to provide Magnolia with adequate protection.

### III. Conclusion

For the reasons set forth above, even if the hotel revenues generated by the operations of the Mechanicsburg Hotel are determined to be property of the estate, the revenues constitute cash collateral subject to Magnolia's secured interest. Debtor has failed to sustain its burden to prove that it is able to safeguard Magnolia from the diminution in the value of its interest in the collateral while it attempts to reorganize. The Motion will be denied.

**By the Court,**

_Mary D France_
Chief Bankruptcy Judge

Date: March 5, 2014